Dear Mr. Townsend:
This is in response to your recent opinion request, wherein you ask:
 "Do Sections 444.500 to 444.755, RSMo Supp. 1975, as amended by H.B. 934, 79th General Assembly, Second Regular Session, provide the Land Reclamation Commission with the authority to enforce and administer the initial regulatory program established pursuant to Sections 502(b), 502(c), and 510(d) of PL 95-87, and the regulations promulgated at 30 C.F.R. § 700, et seq., 42 F.R. 62639-62716 (December 13, 1977)?"
Public Law 95-87, enacted on August 3, 1977, establishes a federal program for the control of strip mining of coal, and the reclamation of lands affected by strip mining operations. The program is divided into two stages, an initial or interim program, and a final regulatory program. During the interim program, mine operators must meet certain of the performance standards set out in the law, while others of the performance standards are not applicable until the final program becomes effective. Under the federal law states are eligible for grant funds during the interim program if they have the authority to enforce the performance standards which are referenced in Sections 502(c) and 510(d) of PL 95-87.
We have carefully examined Section 444.535, enacted by H.B. 934, 79th General Assembly, Second Regular Session, and PL 95-87. Section 444.535 contains language substantially identical to that contained in the portions of Section 515 of PL 95-87 which are referenced in Section 502(c), as well as those referenced in Section 510(d). The only significant change from the federal language is that in Section 444.535 the term "strip mining" is used in place of the federal term "surface coal mining operations". It is apparent that Section 444.535 was drafted with PL 95-87 in mind. In fact, the title to H.B. 934 makes reference to "reclamation performance standards mandated by federal law. . . ." Because of this virtual identity of language, it is our opinion that Section 444.535 provides to the Land Reclamation Commission the authority to enforce and administer the performance standards of the interim program mandated by PL 95-87, except insofar as the definitions of the terms strip mining and surface coal mining operations produce a different result.
These two terms are central to the scope of the regulatory program under the state and federal laws, for in each case performance standards for mining and reclamation are generally applicable only to those operations falling within the definition of the referenced term. Strip mining is defined in the state law thus:
 ". . . mining by removing the overburden lying above natural deposits of coal . . . and mining directly from the natural deposits thereby exposed, and includes mining of exposed natural deposits of coal . . . over which no overburden lies." Section 444.510(18).
In order to determine the exact scope of this term, the definition of "overburden" must also be considered. It is defined thus:
 ". . . all of the earth and other materials which lie above natural deposits of coal . . . and includes such earth and other materials disturbed from their natural state in the process of strip mining." Section 444.510(10).
When the definitions of both these terms are considered, it becomes apparent that the Missouri law, Sections 444.500 to444.755, V.A.M.S., prior to the enactment of H.B. 934 required reclamation only of those lands which were directly disturbed in the process of excavating the coal. Two exceptions to this proposition existed under the statute prior to H.B. 934, which will be discussed later.
Under the federal reclamation law, the scope of the regulation is not so narrowly limited. "Surface coal mining operations" is defined in Section 701(28) of PL 95-87. The definition is too long to be set out here. Suffice it to say that the term includes a wide range of facilities, structures and activities which are constructed on or conducted at sites away from the actual pit or excavation area, but which are directly related to the mining function, such as coal cleaning operations, loading of coal, waste disposal, and haul roads and access roads. Thus, it appears that the intent of the federal law is to regulate and require reclamation of areas which are subject to some disturbance or use during the overall mining operation, but which are outside of the area which is directly disturbed during the excavation process.
As pointed out above, the Missouri law prior to H.B. 934, with two exceptions, did not require reclamation of areas other than those directly disturbed during the excavation of coal. The first of these exceptions is that any area upon which overburden is placed must be reclaimed, even if such area is not at the actual mine site, because Section 444.610.1(8) requires that all affected lands be reclaimed. Affected land is defined in Section444.510(1) to include land upon which overburden has been deposited. Thus, where overburden has been placed at a location away from the mine site, such as in constructing haul roads of this material, that area must be reclaimed.
Second, certain wastes known as gob, produced during coal cleaning operations, must be buried, whether or not they are produced on affected land. Section 444.510.1(7) provides that "[g]ob shall be covered to a depth of not less than two feet with earth or spoil material capable of supporting plant life. . . ." Although all of the land care requirements of Section 444.610.1 are expressly made a condition of the permission to engage in strip mining upon the permitted lands, there is no indication in the statutory language that the requirement as to burial of gob applies only to affected lands. Nor does the definition of gob so limit its effect. Gob is defined thus:
 ". . . that portion of refuse consisting of waste coal or bony coal of relatively large size which is separated from the marketable coal in the cleaning process or solid refuse material, not readily waterborne or pumpable, without crushing." Section 444.510(6).
In addition, we are informed that coal cleaning operations normally occur away from the mine site, on land which does not fall within the definition of affected land. Thus, it appears that the legislature intended to require the burial of gob at any place where it is deposited, whether or not on affected land.
Section 444.535, H.B. 934, places requirements on strip mining operations in addition to those contained in Sections444.500 to 444.755, V.A.M.S. As noted above, the language used in Section 444.535 is substantially identical to the language Congress used to impose the performance standards of the interim program, except that the term strip mining was used in place of the term surface coal mining operations. Thus, the scope of regulatory authority under Section 444.535 is less than that under the interim program established by PL 95-87, insofar as the types of operations, structures and facilities located away from the pit area are concerned. However, Section 444.535 does contain language evidencing a legislative intent to broaden to some extent the area subject to regulation.
Although the performance standards set out in Section444.535.1 are "with respect to strip mining of coal", paragraph (5) of subsection 1 is cast in terms that clearly apply to areas outside the mine site itself. That paragraph provides that the operator shall:
 "(5) Minimize the disturbances to the prevailing hydrologic balance at the mine site and in associated off-site areas and to the quality and quantity of water in surface and ground water systems both during and after strip mining operations and during reclamation by:
* * *
 "(b) Conducting strip mining operations so as to prevent, to the extent possible using the best technology available, additional contributions of suspended solids to stream flow, or runoff outside the permit area, . . .
 "(c) Constructing any siltation structures pursuant to paragraph (b) of this subdivision prior to commencement of strip mining operations, such structures to be certified by a registered professional engineer to be constructed as designed and approved in the reclamation plan;
 "(d) Cleaning out and removing temporary or large settling ponds or other siltation structures from drainways after disturbed areas are revegetated and stabilized; and depositing the silt and debris at a site and in a manner approved by the commission; . . ." Section 444.535.1(5).
We believe that the references to "associated off-site areas", and to preventing "additional contributions of suspended solids to stream flow, or runoff outside the permit area", are a clear indication that the legislature intended to expand the bounds of the Commission's regulatory jurisdiction beyond those areas defined as affected land.
Moreover, subparagraph 5(c) requires any siltation structures required to meet the command of subparagraph (b) to be constructed prior to commencing strip mining operations. It is obvious that those structures cannot be constructed prior to mining unless they are placed outside the area which will become affected land. In addition subparagraph (5) (d) regulates the manner in which the siltation structures are cleaned out and removed after reclamation of disturbed areas is completed. Thus, the legislature clearly authorized the Land Reclamation Commission to regulate off-site operations, as those operations relate to minimizing disturbances to the hydrologic balance, both at the mine site and at associated off-site areas.
Furthermore, Section 444.535.1(6) empowers the Commission to regulate the design, location, construction, operation, maintenance, enlargement, modification, and removal or abandonment of all coal mine waste piles which are used as dams or embankments. This provision is cast in the broadest of terms, and does not appear to be limited solely to those dams or embankments which are located upon affected lands. It includes tailings and coal processing wastes, which would not normally be produced upon affected land. We believe that the legislature intended for the Land Reclamation Commission to regulate such structures wherever located, where the activities producing those structures are related to the mining operations.
In summarizing our comparison of Sections 444.500 to 444.755, as amended by H.B. 934, with the interim program requirements of PL 95-87, we are of the opinion that the state statutes do not provide the Land Reclamation Commission with the authority to carry out all of the requirements of the interim program. However, we believe that the Commission falls short of the authority required by PL 95-87 only with respect to operations, facilities and structures which are located outside any affected land, except where the regulation of such operations, facilities or structures is for the purpose of minimizing disturbances to the prevailing hydrologic balance at the mine site or associated off-site areas, or for the purpose of burial of gob, or the structure is a dam or embankment consisting of mine wastes, tailings, coal processing wastes or other wastes. Where one of the above exceptions exists, the Land Reclamation Commission has the authority to regulate such activities, facilities and structures even though they are not located upon affected lands.
We are of the view that the performance standards set out in H.B. 934 became effective on the effective date of that bill, May 3, 1978. Any coal strip mining conducted on or after May 3, 1978, will have to meet the performance standards set out in Section 444.535, unless otherwise exempted therefrom.
It is our view that Sections 444.500 to 444.755, V.A.M.S., as amended by H.B. 934, 79th General Assembly, Second Regular Session, provide the Land Reclamation Commission with the authority to enforce and administer the initial or interim regulatory program established pursuant to Sections 502(b), 502(c) and 510(d) of PL 95-87, except as to those operations, facilities and structures which are not located upon affected lands, and which are not subject to regulation under Section 444.535.1(5) and (6), H.B. 934, or are not related to the disposal of gob. It is our further view that coal strip mine operators must comply with the requirements set out in Section 444.535 after May 3, 1978, the effective date of H.B. 934.
Very truly yours,
 JOHN ASHCROFT Attorney General